UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT AVILA,<br><br>          Plaintiff,<br><br>    v.<br><br>FORD MOTOR COMPANY,<br><br>          Defendant. | Case No.  22-cv-00542-PCP<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 112, 119, 123, 134, 136 |

Plaintiff Robert Avila alleges that defendant Ford Motor Company sold him a 2018 Ford F-150 without disclosing defects in its transmission or warning him of potential problems. Ford moves for partial summary judgment on Avila's third cause of action for violation of California Civil Code Section 1793.2(a)(3), and on his sixth cause of action for fraudulent concealment. Avila and Ford also move to seal various documents.

Avila does not oppose Ford's motion for summary judgment on his third cause of action, and the Court therefore grants Ford's motion as to that claim. The Court denies defendant's motion for summary judgment on Avila's sixth cause of action because Avila has established a genuine dispute of material fact as to whether Ford fraudulently concealed defects in its 2018 F-150 transmission. The Court also denies Avila's and Ford's motions to seal. Dkt. Nos. 119, 123, 134, 136.

**BACKGROUND**

Robert Avila purchased a 2018 F-150 pickup truck from Future Ford of Concord, an independent Ford dealership, on February 16, 2018. *See* Exhibit 1, Dkt. No. 113, Exh. 1 ¶ 3; Declaration of Plaintiff Robert Avila, Dkt. No. 121.[1] Avila's F-150 had a 10R80 automatic

---

[1] The following facts are undisputed by either party, except as otherwise noted, and come from the parties' briefing, declarations, and attached exhibits.

transmission, which he says had problems including "harsh shifting, clutch engagement issues, and material debris." The Future Ford salesperson did not warn him of any potential problems with his F-150's transmission. *See* Exhibit A, Dkt. 119-3, at 149:7-20; Exhibit 13, Dkt. No. 113-13, at 71:20-24; 72:20-24.

In the years after his February 2018 purchase, Avila sought repairs to his F-150 on multiple occasions. On June 16, 2018, Avila had his F-150's transmission inspected. Exhibit B, Dkt. No. 119-4. On July 2, 2020, Avila reported to a Ford service technician that the check engine light was on and "when driving the radio display turns black and there is no audio" requiring Avila to restart the car. Exhibit 6, Dkt. No. 113-6; Exhibit 5, Dkt. No. 119-4. On July 9, 2020, Avila returned to his Ford dealer for installation of a crank case pressure sensor / vent tube to address the check engine light. Exhibit 7, Dkt. No. 113-7; Exhibit 6, Dkt. No. 119-4.

Avila's issues continued and worsened throughout 2021. On January 5, 2021, Future Ford reported that Avila complained that his "transmission feels like its stuttering in between shifts" and that the "engine revs but does not gain any speed." Exhibit 8, Dkt. No. 113-8; Exhibit 7, Dkt. No. 119-4. On March 2, 2021, Avila complained of a "hard jerk" and "metal clunk" in his car while driving. Exhibit 9, Dkt. No. 113-9; Exhibit 8, Dkt. No. 119-4. Repair technicians found "abnormal amounts of metal indicating internal damage" in the transmission and replaced parts of the transmission. Exhibit 9, Dkt. No. 113-9; Exhibit 8, Dkt. No. 119-4. On June 12, 2021, Avila complained of a transmission downshift at high speeds with his Ford technician noting that the "concern is a[ ]lot worse than previous concern." Exhibit 11, Dkt. No. 113-11; Exhibit 10, Dkt. No. 119-4. The technician recommended removing the transmission and observed that a part of the 10R80 transmission had moved out of place. Exhibit 11, Dkt. No. 113-11; Exhibit 10, Dkt. No. 119-4. On October 13, 2021, Avila complained that the transmission "clunks when going into reverse." Exhibit 12, Dkt. No. 113-12; Exhibit 12, Dkt. No. 119-4.

Avila filed his complaint against Ford in Santa Clara County Superior Court in August 2021. Ford removed the case to this court in January 2022. After several years of discovery, Ford moved for partial summary judgment on July 25, 2025, and this Court heard argument on the motion on September 23, 2025.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party may submit affidavits to support a Rule 56 motion for summary judgment. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587.

**ANALYSIS**

As noted above, Ford moves for summary judgment on Avila's common law fraudulent concealment claim. Fraudulent concealment requires "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) plaintiff sustained damage as a result of the concealment or suppression of the material fact." *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024). As set forth below, a genuine dispute of material fact exists as to the first four elements, and Ford does not dispute the fifth.

**I.    Concealment or Suppression of a Material Fact**

To show a triable issue on "concealment or suppression," Avila must point to record evidence that would raise a genuine dispute of material fact as to whether Ford was aware of but concealed transmission defects in its 2018 F-150. *See Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1131 (9th Cir. 2014). Avila contends that Ford's technical service bulletins (TSBs) constitute such evidence.

3

A technical service bulletin is a document that car makers issue to help repair professionals address problems with vehicles. *See* Justin Pritchard, *What is a Technical Service Bulletin (TSB)?*, DRIVING (Oct. 19, 2022), https://driving.ca/features/maintenance/what-is-a-technical-service-bulletin-tsb. Ford issued several TSBs in the years leading up to Avila's purchase, with at least four relevant here. First, Ford issued a TSB on December 14, 2017, explaining, "Some 2017 F-150/Raptor vehicles equipped with a 10R80 automatic transmission built on or before 1-Aug-2017 may exhibit harsh or delayed shifts and/or an illuminated malfunction indicator lamp…" Exhibit Q, Dkt. No. 119-18, at 1; Declaration of Dara Tabesh, Dkt. No. 120, at 2. Second, Ford issued a TSB on March 2, 2018, just after Avila bought his 2018 F-150 in February 2018, warning about similar problems. Exhibit R, Dkt. No. 119-19, at 1. While both the December 2017 and March 2018 TSBs deal with *2017* F-150s, as opposed to Avila's 2018 F-150, because both vehicles used the same 10R80 transmission, and in the absence of any evidence that Ford had fixed the transmission issues in the 2017 F-150s that used that transmission, a jury could conclude from these TSBs both that Ford's 2018 F-150s equipped with the same transmission had similar transmission issues and that Ford was aware of them.

Ford issued the third and fourth TSBs shortly after Avila's February 2018 purchase. These TSBs likewise provide evidence from which a reasonable jury could conclude that Ford concealed concerns about transmission defects from Avila. As Avila notes, TSBs "issued *after* the sale of the Subject Vehicle are [potentially] relevant to Ford's *pre*-sale knowledge of the Transmission Defect" because "its knowledge of a defect may necessarily predate its publication of that knowledge." Ford issued TSBs two and four months after Avila's February 2018 purchase. They indicate that 2018 F-150s "built on or before" November 20 and 30, 2017, "may exhibit an illuminated malfunction indicator lamp." Exhibit GG, Dkt. No. 119-31, at 1; Exhibit HH, Dkt. No. 119-32, at 1. While the third and fourth TSBs only explicitly discuss problems with an "illuminated malfunction indicator lamp," when considered together with the first and second TSBs, a reasonable jury could conclude that Ford's 10R80 transmission in both the 2017 and 2018 F-150s suffered serious problems that manifested in different ways over time and that Ford was aware of that problem.

4

To be certain, many of the documents Avila identifies in opposing summary judgment do not establish a genuine dispute. For example, Avila points to evidence dating to long after his purchase. *See* Exhibit K, Dkt. No. 119-13, at 127:22-128:5 (quoting Ford's corporate representative Kevin Norris learning of "the potential" for "sleeve movement on a 10R80 vehicle" in "early to mid 2021"). That evidence does not suggest anything about what Ford knew on or before February 2018 and so is not probative as to whether Ford concealed or suppressed information about transmission defects at the time of Avila's purchase.

Ford separately argues that it did not conceal anything from Avila because it "disclosed to [Avila] in the Warranty Guide at the point of sale that the existence of the Express Warranty did not mean the vehicle would be defect free, and that defects might be unintentionally introduced into the vehicle." But in acknowledging that Avila's vehicle "might" have defects, Ford did not inform Avila of existing transmission defects of which the jury might conclude Ford was already aware. *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) ("Plaintiffs show knowledge of falsity and intent to defraud by pleading facts that demonstrate that GM knew about the alleged defects [in its speedometers], yet did nothing to fix them or to alert customers."); *see also id.* at 1097 (denying motion to dismiss Consumer Legal Remedies Act against GM for "never ma[king] any attempt to notify other customers or effect a recall" of its specific, defective speedometer); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1134 (N.D. Cal. 2010) (concluding that plaintiffs stated a claim for fraudulent concealment by alleging in part "that Defendants actively concealed" knowledge of defects in washing machines "when 'Plaintiffs and Class members contacted Sears for service of their defective Machines and were either told the Machines were not defective or denied free service or replacement of the defective parts'"); *cf. also In re Alphabet, Inc., Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) ("[T]he [securities fraud] complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized."). The Warranty Guide's disclaimer thus does not preclude Avila's fraudulent concealment claim.

## II.    Duty to Disclose

Ford argues that it did not owe Avila a duty to disclose because Avila bought his car from

United States District Court
Northern District of California

an independent Ford dealership and Ford had no direct dealing with Plaintiff. In Ford's view, "[d]ealerships, even authorized ones, are not agents of automobile manufacturers."

Tellingly, Ford cites no California case suggesting that vehicle manufacturers that sell through dealerships can withhold material information from consumers simply because they have no disclosure duty. To the contrary, numerous federal and California state decisions assume that a manufacturer that sells its vehicles through independent dealers has a duty to disclose material information. *See, e.g.*, *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 960–61 (N.D. Cal. 2018); *Dhital v. Nissan N. Am., Inc.*, 84 Cal. App. 5th 828, 844 (2022); *Lessin v. Ford Motor Co.*, 756 F. Supp. 3d 885, 944 (S.D. Cal. 2024); *Paperno v. Whirlpool Corp.*, 2024 WL 1091192, at *3 (N.D. Cal. Mar. 13, 2024); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1191–93 (C.D. Cal. 2010).

Given the frequency with which vehicle manufacturers have faced fraudulent concealment claims under California law and the absence of any California authorities rejecting the viability of such claims, the Court would be reluctant to conclude that California law in truth imposes no duty of disclosure on such manufacturers.[2] And to the extent the California courts have addressed the issue, the most on-point authority is *Dhital v. Nissan North America*, 84 Cal. App. 5th 828.[3] In that case, the California Court of Appeal explained that a "duty of disclosure … *may* arise from a relationship between the parties, such as a buyer-seller relationship" between the consumers and the car dealership, *id.* at 843 (emphasis added), but concluded at the pleadings stage that the plaintiff could also assert a claim premised on the vehicle manufacturer's duty to disclose. The court held that plaintiffs had adequately pleaded that Nissan owed plaintiffs a duty to disclose because plaintiffs "alleged that they bought the car from a Nissan dealership, that Nissan backed the car with an express warranty, and that Nissan's authorized dealerships [were] its agents for

---

[2] The cases Ford cites in support of its argument do not establish that dealerships can *never* be agents of manufacturers, only that they are not *always* agents. *See Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 845–46 (W.D. Pa. 2007); *Keegan v. Am. Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 953 (C.D. Cal. 2012).

[3] On questions of state law, the decisions of the California Courts of Appeal are persuasive precedent in the absence of evidence that the California Supreme Court would not adopt that position. *See Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1069 (9th Cir. 2020).

purposes of the sale of Nissan vehicles to consumers." *Id.* at 844.

The evidence here would likewise allow a jury to find that the Ford dealership from which Avila purchased his F-150 was Ford's agent for all purposes relevant to his fraudulent concealment claim, which centers on the information that was and was not provided to Avila at the time of his vehicle purchase. Like the plaintiff in *Dhital*, Avila bought his vehicle from a dealership, and Ford backed the truck with an express warranty. And as Ford admitted at the hearing on its motion, Ford sells its vehicles *exclusively* through dealers, relying on those dealers to convey information about its vehicles to consumers and "for purposes of the sale of [Ford] vehicles to consumers." *Id.* Avila himself testified that he "figured [the salesperson he talked to] worked for Ford, he's part of Ford." Exhibit A, Dkt. No. 119-3, at 81:16-17.[4] There is no dispute that Ford dealerships are a major conduit through which Ford conveys information about product recalls or TSBs to consumers, and as Ford also admitted at oral argument, the practical reality is that a dealer will provide a consumer with material information it receives from Ford.

Imposing a duty of disclosure under these circumstances makes sense and serves the underlying purposes of the common law fraudulent concealment tort. If someone wants information about a particular Ford vehicle they are considering purchasing, the Ford dealership from which they may buy that vehicle is often the most obvious source of information. The dealership, however, is dependent on Ford's disclosure of material information to those dealerships. Assuming Ford knew of a defect in Avila's F-150 transmission and those facts were "known or accessible only to" Ford, the only way they could reasonably reach consumers would be through a disclosure by Ford either directly to consumers or to its dealers. *Rattagan*, 17 Cal. 5th at 40. The purpose of California's fraud cause of action is to encourage the disclosure of such truthful information to consumers. *See id.* (explaining that fraudulent concealment deters misrepresentation "in the future while encouraging a 'business climate free of fraud and deceptive practices'") (quoting *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 92 (2004));

---

[4] Because the evidence would permit a jury to find that the dealership was Ford's actual agent, the Court need not consider at this time whether Ford could also be liable on an ostensible agency theory.

*see also Lazar v. Superior Court*, 12 Cal. 4th 631, 646 (1996) ("In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future.").

The evidence would thus permit a jury to conclude that Ford interacted directly with Avila (through an agent) in a manner sufficient to create a potential duty to disclose. Whether such a duty actually existed depends upon the circumstances of that interaction. *See Rattagan*, 17 Cal. 5th at 40 (listing five sufficient conditions to create a duty to disclose). California courts have recognized such a duty where the defendant had "exclusive knowledge," meaning "the material facts [were] known or accessible only to defendant, and defendant kn[ew] those facts [were] not known or reasonably discoverable by plaintiff." *Id.*

The evidence here creates a genuine dispute as to whether Ford had "exclusive knowledge" and a corresponding duty to disclose. As noted above, the evidence is sufficient to permit a finding that Ford was aware of the problems with the 2018 F-150 transmission at the time of Avila's purchase. And there is no evidence that Avila was aware of those problems. Avila testified that he relied on the "word of mouth from the" Ford salesperson, Sal, who to Avila's memory only promoted the vehicles and did not discuss any specific problem with them. Exhibit A, Dkt. No. 119-3, at 72:13-16; 74-75:16-22. Avila could not recall whether the dealer salesperson he spoke to discussed his F-150's transmission and assumed only that "it was a brand new truck" and that therefore "[e]verything should be working correctly." *Id.* at 82-83:25-2. Ford admits that Avila "did not discuss the transmission of the Subject Vehicle with any dealership personnel before or at the point of sale."

This evidence would thus permit the jury to conclude that Ford had knowledge of facts regarding Avila's F-150 that were "known or accessible only to" Ford, *Rattagan*, 17 Cal. 5th at 40, and that Avila did not know about and could not reasonably discover the transmission defects. These facts would suffice to create a duty of disclosure.

**III.     Intent to Defraud**

Intent requires showing "an intent to conceal a defect" and evidence that the defendant "was aware of a defect … that it was either unwilling or unable to fix." *Santana v. FCA US, LLC*,

56 Cal. App. 5th 334, 345–46 (2020); *Moore v. Am. Honda Motor Co., Inc.*, 2025 WL 948114, at *8 (N.D. Cal. Mar. 28, 2025).

As discussed above, Avila points to significant evidence that Ford knew about the risk of a transmission defect in its F-150 transmission in the period leading up to and immediately after Avila's purchase. In his opposition, Avila points to "Ford's internal documents, TSBs, and testimony." Again, as discussed above, one of Ford's TSBs that pre-date Avila's purchase and one that came shortly after his purchase, the December 2017 and March 2018 TSBs, respectively, could lead a reasonable jury to conclude that Ford knew that its 2018 F-150s might have transmission issues similar to those reported in those two TSBs. Exhibit Q, Dkt. No. 119-18, at 1; Exhibit R, Dkt. No. 119-19, at 1. Similarly, two other TSBs that post-date Avila's February 2018 purchase support a conclusion that Ford concealed concerns because those TSBs necessarily suggest knowledge that Ford held in the period immediately leading up to their publication. Exhibit GG, Dkt. No. 119-31, at 1; Exhibit HH, Dkt. No. 119-32, at 1. While only explicitly discussing problems with an "illuminated malfunction indicator lamp," the TSBs establish that Ford knew of problems with its 10R80 transmissions in 2018 F-150s around roughly the same time as Avila's purchase of his 2018 F-150. Thus, Avila has established a genuine dispute of material fact as to whether Ford had the requisite intent required for fraud by concealment or omission.

Ford argues that Avila cannot establish that any one of its "officers, directors or managing agents knew of and concealed any widespread 'transmission defect' in the 10R80 transmission prior to or at the point of sale to Plaintiff." Motion for Summary Judgment at 12:23-25. Though some Ford emails *discussed* transmission issues, as Ford acknowledges, Ford contends that there is no evidence of a "widespread defect" when those emails are "read in their proper context." But plaintiffs do not need to show any one specific person knew of and concealed a defect. Plaintiffs must show only a genuine dispute as to whether *someone* at Ford was aware of the defect. Plaintiffs also do not need to show that Ford or its agent "knew" of a defect that "would manifest in Plaintiff's vehicle." Avila only needs to show that Ford knew of a *risk* of a defect that would appear in his vehicle.

**IV.    Reliance**

A defendant's omission of a material fact need only be "a substantial factor in [the plaintiff's] decision." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). Avila testified that, "Had Ford disclosed the Transmission Defect to me, I would not have purchased the" F-150. Declaration of Robert Avila, Dkt. No. 121, at 2. According to Avila, "If [the salesperson] told me anything [was] wrong with the transmission, why would I buy it if there's a problem with the transmission. That's stupid." Exhibit A, Dkt. No. 119-3, at 153:1-3. Avila says that he would not have purchased the F-150 without the Ford salesperson's pitch, explaining that the salesperson "wouldn't give [him] a deal if [he] came back" and added that he was "always jittery about buying stuff" like the F-150, which was "a big purchase for me." Exhibit 13, Dkt. No. 113-13, at 80:20-22. From this evidence, a reasonable jury could conclude that Avila relied on his understanding, fostered by Ford's failure to disclose, that his F-150 did not have a defect, acted on that understanding, and would have acted differently if he understood differently.

Ford argues that Avila has not raised a genuine dispute of material fact as to his reliance because "he did not review or rely upon any advertisements, marketing materials, or communications regarding the transmission equipped in the [F-150]." In support, Ford cites *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1089 (1993), as holding that establishing reliance in a deceit cause of action requires "having read alleged misrepresentations." But *Mirkin* featured affirmative alleged misrepresentations. 5 Cal. 4th at 1089. Avila brings a fraudulent concealment/omission claim. Such claims do not require a plaintiff to have read or relied upon an affirmative misrepresentation, only that the plaintiff would have read or relied upon the non-disclosed information had it been disclosed.

As discussed above, a reasonable jury could conclude that the Ford dealership here acted as Ford's agent in convincing Avila to purchase the vehicle and that the dealership provided information about Avila's F-150 without disclosing the defective transmission. Again, as Ford conceded at argument, Ford sends bargaining materials, warranty guides, and TSBs to dealerships, on which consumers rely to become informed about potential purchases as a matter of practical reality. For that reason, a jury could reasonably conclude that Avila would have learned about the

United States District Court
Northern District of California

transmission if Ford had relayed that information to its dealerships to share with consumers.

The evidence thus creates a genuine dispute of material fact as to Avila's reliance on Ford's omissions.

\*       \*       \*

In sum, there are genuine disputes of material fact as to the first four elements of Avila's fraudulent concealment claim, and Ford does not dispute that Avila may be able to establish the fifth element. For that reason, Ford's motion for summary judgment on Avila's fraudulent concealment claim is denied.

## VI.    Motions to Seal

Avila and Ford also ask the Court to seal various documents submitted in support of their motions. The public has a longstanding and well-recognized "right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Public access bolsters "understanding of the judicial process" and "confidence in the administration of justice," and it provides a "measure of accountability" for courts. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). There is thus a "strong presumption in favor of access" to court records. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

To overcome this strong presumption, a party that wishes to seal a court record must generally "articulate compelling reasons supported by specific factual findings ... that outweigh the general history of access and the public policies favoring disclosure." *Id.* at 1178–79 (cleaned up). Sealing may be justified when "court files ... become a vehicle for improper purposes, such as ... to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179 (internal quotation mark omitted). But without more, the "mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation" does not merit sealing. *Id.* "Under this stringent standard," the Court must "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Ctr. for Auto Safety*, 809 F.3d at 1096–99 (cleaned up).  Civil Local Rules 79-5(c)(1) and (f)(3) require the party seeking to seal to provide "a specific

11

statement" of the reasons for doing so, explaining the interests that warrant sealing, the injury that will otherwise result, and the insufficiency of a less restrictive alternative to sealing.

There are three different sets of requests to seal documents. First, Avila moves to seal 30 documents attached to his opposition because Ford previously designated them confidential. Dkt. No. 119. Ford has filed a statement to support the sealing of 27 of those exhibits. *See* Dkt. No. 124. Ford argues that those exhibits should be sealed because their disclosure could "harm" Ford's "competitive standing." *Warner Commc'ns, Inc.*, 435 U.S. at 598–99.[5] Though many of the exhibits do concern Ford's internal operations, Ford has not provided "specific factual findings … that outweigh the general history of access and the public policies favoring disclosure." *Kamakana*, 447 F.3d at 1178–79 (cleaned up). Most of the documents Ford seeks to seal were created years ago, undermining an inference of competitive harm. And Ford must connect specific documents to specific facts that justify sealing, which Ford has not done. Accordingly, Avila's motion to consider whether another party's material should be sealed is denied. *See* Dkt. No. 119.

Second, Avila moves to seal additional exhibits that were appended to its unredacted and corrected opposition, noting Ford's prior designation of the documents as confidential. Dkt. No. 123. Ford does not seek to seal those documents and requests that the motion be denied. Dkt. No. 128. Because Ford does not seek to seal these documents, Avila's motion, Dkt. No. 123, is denied.

Third, Ford has filed a renewed motion to seal portions of its motion to exclude the opinions of plaintiff's expert Randall Bounds. Dkt. No. 134. On August 22, 2025, this Court granted in part and denied in part Ford's first motion to seal portions of Bounds's opinions. Dkt. No. 125. On September 2, 2025, this Court stayed its order as to Exhibits 6 to 10 of the Waldon Declaration to allow Ford to file a supporting declaration from a Ford engineer in support of its motion to seal. Dkt. No. 132 (regarding Dkt. Nos. 89-7, 89-8, 89-9, 89-10, and 89-11).

As with the first set of documents, Ford has not established compelling reason to overcome the strong presumption in favor of public access. *See Kamakana*, 447 F.3d at 1178–79; *Ctr. for*

---

[5] The three documents Ford does not seek to seal are Avila's Unredacted Opposition to Motion for Summary Judgment, Dkt. No. 119-39, and Exhibits K and Y, Dkt. Nos. 119-13, 119-26.

*Auto Safety*, 809 F.3d at 1098. Ford provides a declaration from one of its engineers stating that Exhibits 6, 7, 8, and 9 "could be used in the design and development efforts of Ford's competitors without the competitors investing the substantial resources already invested by Ford over numerous years." Declaration of Kevin Payne in Support, Dkt. No. 134-1, at 4–5 ¶ 13. Ford also argues that Exhibit 10 would produce "competitive harm" because it shows how Ford engineers analyze problems and could help competitors "to improve their own problem solving processes without investing the substantial resources invested by Ford." *Id.* at 6 ¶ 17. The exhibits in question, however, all date back to 2012, 2015, or 2018. Even if some competitive harm might result from the exhibits' disclosure, Ford has not shown why its preference for secrecy establishes a compelling reason to override the judicial system's "strong presumption" in favor of public access to judicial records and documents. *See Ctr. For Auto Safety*, 809 F.3d at 1097. And while Ford is correct that "this analysis must be carried out on a case-by-case, document-by-document level," Ford has not met its burden of showing on a "case-by-case, document-by-document level" why each exhibit and document presents the harm that Ford says it does. Therefore, Ford's renewed motion to seal is denied.

Lastly, plaintiff Avila has moved to seal his opposition's use of *descriptions* of the same Ford materials. Dkt. No. 136. Ford does not contend that this material must be sealed. Dkt. No. 140. Accordingly, the motion is denied at to these descriptions.

**CONCLUSION**

For the reasons set forth above, defendant Ford's motion for summary judgment is granted as to Avila's third cause of action for a violation of California Civil Code Section 1793.2(a)(3) and denied as to his sixth cause of action for common law fraudulent concealment. Avila's and Ford's motions to seal are denied. By March 3, 2026, the parties shall file on the public docket copies of all documents addressed in this Order that were previously filed provisionally under seal.

**IT IS SO ORDERED.**

Dated: February 24, 2026

P. Casey Pitts
United States District Judge